IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 08-00513 JMS |
| | ) | |
| Plaintiff, | ) | POST-REMAND ORDER DENYING |
| | ) | DEFENDANT'S MOTION TO |
| vs. | ) | SUPPRESS |
| | ) | |
| SIMON JASPER McCARTY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## POST-REMAND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS

## I. INTRODUCTION

On August 5, 2008, Defendant Simon Jasper McCarty ("Defendant"),

a United Kingdom national, was traveling from Hilo to Honolulu when the

Transportation Security Administration ("TSA") found photographs of naked

prepubescent children in his luggage. As a result of this discovery and a

subsequent investigation, the Second Superseding Indictment ("SSI") charges

Defendant with ten counts of child pornography, including: two counts of

knowingly transporting child pornography in interstate commerce on July 28, 2008

in violation of 18 U.S.C. §§ 2252A(a)(1) and (b)(1) (counts 1 and 2), two counts of

knowingly possessing child pornography on August 5, 2008 in violation of 18

U.S.C. §§ 2252(a)(5)(B) and (b)(2) (counts 3 and 4); and five counts of coercing a

minor to engage in sexually explicit conduct for the purpose of producing visual depictions of such conduct in violation of 18 U.S.C. §§ 2251(c)(1)(B) and 2251(e) (counts 5-10).

On April 13, 2009, Defendant filed a Motion to Suppress all evidence obtained as a result of the August 5, 2008 search of his luggage at the Hilo International Airport. Defendant argued that (1) the TSA performed an overbroad search of his luggage such that there was no probable cause supporting the arrest, (2) he did not give informed consent for the Hawaii County Police Department ("HCPD") to search his luggage, and (3) he did not knowingly and voluntarily waive his *Miranda* rights. On December 24, 2009, the court granted Defendant's Motion, finding that the TSA screeners had performed an overbroad search and the court could not determine what materials TSA screeners had seen as part of their permissible search such that the government had not carried its burden of establishing probable cause to arrest Defendant. *See United States v. McCarty*, 672 F. Supp. 2d 1085 (D. Haw. 2009). As a result, the court suppressed all evidence obtained during the subsequent consent and warrant-based searches as fruit of the poisonous tree.

On appeal, the Ninth Circuit vacated the suppression order and remanded for further proceedings. *See United States v. McCarty*, 648 F.3d 820

(9th Cir. 2011).  The Ninth Circuit held, among other things, that although the TSA

screeners performed an overbroad search by reading papers in Defendant's

luggage, the screeners viewed the photographs as part of their administrative

search and they could be considered in making the probable cause determination.

After receiving post-remand briefing from the parties and hearing

additional oral argument, the court finds that the photographs the TSA screeners

viewed as part of their administrative search supported a probable cause finding to

arrest McCarty for violation of Hawaii Revised Statutes ("HRS") § 707–752,

promotion of child abuse in the third degree.  The court also rejects Defendant's

additional arguments seeking suppression and therefore DENIES Defendant's

Motion to Suppress.

## II.  ANALYSIS

### A.    Probable Cause for Arrest

As explained in earlier orders,[1] Defendant checked two bags while

traveling from Hilo to Honolulu -- a Travel Pro bag and a Travel Zone bag.

During screening at Hilo International Airport, Defendant's Travel Pro bag was

flagged as a possible safety concern due to what appeared to be a laptop with a

---

[1]  Because the underlying facts and procedural history of Defendant's Motion to Suppress
have already been outlined in the previous orders by this court and the Ninth Circuit, the court
focuses on only those facts that are directly relevant to the current issues before the court.

dark mass around it.  TSA screener Dorina Andrade ("Andrade") subsequently

pulled out the laptop, at which point an envelope slid out, spilling some of its

contents.

As previously described, *see McCarty*, 672 F. Supp. 2d at 1092, the

contents of the envelope included photographs of nude and partially clothed

children, Gov't Exs. 1-56, newspaper and magazine clippings describing sexual

acts including sex between minors and trial testimony of sexual encounters

between a minor boy and a woman, *id*. at 72-75, magazine clippings of children's

pajama, underwear, and swimwear advertisements, *id*. at 59-71, and handwritten

notes drafted in the first person describing a man molesting boys and a girl.  *Id*. at

80-81.  Of the 58 photographs from the envelope, 57 are of minor children in

various states of undress -- for example, young boys with no shirts on, boys in their

underwear only, one shirtless boy laying down while a hand reaches toward his

pants, and one boy lying face up on top of Defendant while Defendant lifts up the

boy's shirt.  Eleven photographs include child nudity, some of which are not child

pornography and might appear almost innocent if viewed in isolation, *see id.* at

Exs. 7, 10, 58, *McCarty*, 672 F. Supp. 2d at 1101, while three (in particular Exs. 1-

3) focus on the child's genitalia and are clearly meant "to arouse or satisfy the

sexual cravings of a voyeur."  *See United States v. Overton*, 573 F.3d 679, 686 (9th

Cir. 2009) (quoting *United States v. Hill*, 459 F.3d 966, 972 (9th Cir. 2006)); *see also McCarty*, 672 F. Supp. 2d at 1092 (describing the eleven photographs).

Andrade, assisted by TSA screener Jenny Moniz ("Moniz"), viewed the photographs that had fallen out of the envelope, viewed some of the photographs that remained in the envelope, and read portions of the written materials during their search. In light of what they saw, Andrade called her supervisor; TSA lead Tracy Kitamura ("Kitamura") and TSA supervisor Stephanie Kamohai ("Kamohai") subsequently reviewed the materials before calling Hilo Airport law enforcement officer Rodney Aurello ("Aurello").[2] Based on Aurello's review of some of the photographs, he called HCPD. HCPD officer Norbert Serrao ("Serrao") reviewed the materials and arrested Defendant for violation of HRS § 707-752, promotion of child abuse in the third degree.

This court found and the Ninth Circuit agreed that Andrade and Moniz went beyond the scope of a lawful administrative search and violated Defendant's Fourth Amendment rights by reading the written materials from the envelope that had fallen out of Defendant's Travel Pro bag. *See McCarty*, 648 F.3d at 836 (holding that Andrade's actions of reading the content of letters and

---

[2] Kamohai also directed Moniz to search Defendant's Travel Zone bag. The government does not dispute that this search violated Defendant's Fourth Amendment rights. The court addresses the impact of this violation at the end of its analysis.

looking at the newspaper articles and advertisements fell outside the scope of an administrative search). Both this court and the Ninth Circuit further agreed that the probable cause determination could not be based solely on what Serrao reviewed -- he reviewed photographs that Andrade did not review, and read the textual materials which went beyond what an administrative search should have included.[3]

The Ninth Circuit clearly differed with this court, however, in whether Andrade viewed at least some photographs for administrative purposes or solely to investigate her suspicions that the photographs were child pornography. This court found that it could not determine which photographs Andrade and Moniz saw during the course of the lawful administrative search, as opposed to purely a search for child pornography. *McCarty*, 672 F. Supp. 2d at 1101-02. This court concluded that "the government has failed to carry its burden that the TSA properly uncovered photographs that would support probable cause to arrest Defendant." *Id.* at 1102.

The Ninth Circuit disagreed with this court's factual findings, determining that Andrade consistently testified that she reviewed the photographs for safety reasons such that "all of the photographs viewed by the screeners as part

---

[3] As stated by this court and the Ninth Circuit, "[t]he parties agreed that McCarty's arrest would have been valid if the administrative search produced probable cause to believe he had violated" HRS § 707-752. *United States v. McCarty*, 648 F.3d 820, 828 n.7 (9th Cir. 2011); *United States v. McCarty*, 672 F. Supp. 2d 1085, 1095 (D. Haw. 2009).

of the lawful search for explosives must be considered in reaching a probable cause determination."[4]  *McCarty*, 648 F.3d at 839.  The Ninth Circuit further outlined the steps this court must take to determine whether probable cause existed to arrest Defendant -- requiring the court to determine (1) what photographs Andrade and Moniz viewed as part of their administrative search; and (2) whether those photographs support probable cause to arrest Defendant for violation of HRS § 707-752.[5]  The court now addresses these steps.

### 1.     *Photographs Viewed by Screeners*

The Ninth Circuit instructed this court to determine what photographs the screeners viewed during their administrative search of Defendant's Travel Pro bag:

> On remand, the district court's probable cause
> determination should proceed in two steps.  First, the
> court should decide what materials may be considered in
> determining whether probable cause existed to arrest
> McCarty.  As [*United States v. Jensen*, 425 F.3d 698 (9th

---

[4]  At the November 21, 2011 hearing, Defendant conceded that all photographs viewed by Andrade and Moniz were within the scope of a lawful administrative search, yet at the December 2, 2011 hearing, Defendant appeared to argue the opposite.  To the extent that Defendant continues to argue that Andrade may have viewed some photographs to determine their nature as opposed to for safety concerns, the court rejects this argument in light of the Ninth Circuit's ruling.

[5]  The Ninth Circuit further outlined a third step requiring the court to determine whether the violation of Defendant's Fourth Amendment rights requires suppression of any evidence. *McCarty*, 648 F.3d at 840.  The court addresses this step after addressing all of Defendant's arguments for suppression.

Cir. 2005),] illustrates, courts generally consider the information known to the arresting officers at the time of the arrest. Here, Serrao testified that he had viewed all of the photographs in McCarty's envelope and perhaps also some of the textual materials before making the arrest.

The general rule must, however, be narrowed here, because the fruits of an unlawful search cannot provide probable cause for an arrest, *see Johnson v. United States*, 333 U.S. 10, 16-17, 68 S. Ct. 367, 92 L.Ed. 436 (1948), and it is clear some portion of this search was unlawful. Although -- consistent with our enumeration of the search's lawful scope -- all of the photographs viewed by the screeners as part of the lawful search for explosives must be considered in reaching a probable cause determination, the textual materials seen by the screeners may only be considered if the government demonstrates that suppression is an inappropriate remedy. Similarly, the photographs *not* viewed by the screeners may be considered only if they do not constitute fruit of the poisonous tree.

*McCarty*, 648 F.3d at 839.

This task is easier said than done -- this court and the Ninth Circuit have recognized that Andrade did not consistently testify regarding "exactly which images she saw, how many photographs spilled onto the table, and whether she touched or did not touch the photographs on the table before calling the lead officer."[6] *McCarty*, 648 F.3d at 838; *McCarty*, 672 F. Supp. 2d at 1096. Indeed, Andrade provided inconsistent testimony regarding the scope of her inspection of

---

[6] Each time Andrade was asked to identify the photographs she saw during her screening, Andrade identified different photographs. *See* Doc. No. 57 at 26-28, 58-59.

the photographs.  For example, in one instance Andrade testified that she "inspected whatever pictures were on the table first" and then turned to those that remained in the envelope.  Doc. No. 57 at 67; *see also id.* at 55.  At other instances, Andrade testified that she went through less than half of the photographs on the table, *id.* at 61, 74, and at still other instances she testified that she merely "looked" at the photographs on the table without touching them or seeing any of the photographs that may have been underneath those that were on top.  *Id.* at 85-88.  What is clear from her testimony, however, is that she did not review all of the photographs -- she stopped her search before going through all the photographs that had remained in the envelope.  *Id.* at 97-98.

The court's inquiry, however, does not stop at Andrade.  At a minimum, the screeners that viewed the photographs as part of an administrative search included not only Andrade, but also Moniz.  *See* Doc. No. 90, Def.'s Post-Remand Br. at 6 (conceding that Moniz assisted Andrade in the administrative search such that the photographs she reviewed must be considered).  Further, regardless of whether Kitamura, Kamohai, and Serrao reviewed the photographs as part of any administrative search,[7] their testimony, along with that of Moniz,

---

[7]  The government argues that Kamohai reviewed all of the photographs -- including those in the envelope -- as part of a safety check.  *See* Doc. No. 91, Gov't Post-Remand Br. at 8-9.  The testimony of Kamohai and Andrade on this point is not as clear as the government

(continued...)

provides insight into what images Andrade and Moniz in fact observed during their administrative search. Moniz, Kitamura, Kamohai, and Serrao answered questions directly, displaying an appropriate recall of events. Unlike Andrade, based on the court's observations of these witnesses and their overall manner of testifying, the court finds their testimony credible. And based on their credible testimony, the court is able to determine several photographs that Moniz and Andrade in fact did observe during their administrative search.

As a starting place, Moniz provided a clear and credible picture of the steps she and Andrade took and was able to identify some of the photographs she saw. Moniz testified that when she came over to assist Andrade, the photographs that had fallen out of the envelope were "scattered on the table" and that she and Andrade picked up the photographs and collected them. *Id.* at 123, 127-31. Moniz further testified that as they were collecting the scattered photographs to put back in the envelope, "at that point we saw something that was improper, we did look

---

[7](...continued)
suggests -- although Kamohai testified that she "shuffled" through the photographs, *see* Doc. No. 57 at 189, 191-92, 201, it is not clear that she performed this task as part of an administrative search to clear the bag. *See id.* at 99-100 (Andrade testifying that when she stopped searching, she was satisfied that she had done what was necessary to determine there were no safety issues). Because the specific images that Andrade and Moniz saw provide probable cause to arrest Defendant, however, the court need not ultimately determine whether Kamohai reviewed the photographs as part of an administrative search. For this same reason, the court need not address the government's arguments on inevitable discovery or *Herring v. United States*, 555 U.S. 135 (2009).

through *the rest of them*, and then we stopped." *Id.* at 131 (emphasis added). In other words, according to Moniz -- who this court finds credible -- Moniz and Andrade reviewed *all* of the photographs that had fallen out of the envelope. Because Moniz did not recall personally looking through the photographs in the envelope, *id.* at 133, the court concludes that the photographs Moniz and Andrade viewed included all of the photographs that had fallen out of the envelope and a portion of the photographs that remained in the envelope (which Andrade apparently viewed alone).

As to the specific photographs she saw, Moniz recalled seeing photographs of "[a] child that was naked like a pond setting by a rock. Another child that was naked standing -- maybe like two or three years old and just standing there nude." *Id.* at 140-41. Moniz further recalled a "specific photo of a child laying on a bed. It was the top half of his body, he was without a shirt on, he laid there in a very stiff position with his eyes squinted shut to hold it shut like he was very uncomfortable." *Id.* at 140. After carefully reviewing all of the photographs, the court finds that Moniz' first description is consistent with either Government's Exhibits 4, 5, or 6, the second description is consistent with Government's Exhibit 7 or 10 (or possibly even Exhibit 8), and the third description appears most consistent with Government's Exhibits 15, 18, or 19.

Turning to the testimony of Kitamura, Kamohai, and Aurello, the court is able to identify at least one additional photograph that Andrade and Moniz necessarily saw during their search. Their collective testimony confirms that after Andrade and Moniz conducted their administrative search, none of these individuals disrupted the placement of the photographs between those that had fallen out of the envelope (that is, those left on the table after Andrade and Moniz' review) and those that remained in the envelope (of which Andrade viewed a portion).[8] As a result, their testimony describing the photographs they saw outside the envelope describes what Moniz and Andrade necessarily saw during their administrative search.

Specifically, Kitamura was the next individual after Moniz and Andrade to review the materials, and he testified that he reviewed only those photographs that were outside of the envelope, which included photographs of nude and partially-clad children. *See id.* at 176-77, 179-81. Next, Kamohai "shuffled" through the materials, apparently maintaining the separation between

---

[8] Andrade's testimony that "[w]e took out the pictures from the envelope and we left it on the table," Doc. No. 57, at 97, could not have included *all* of the photographs from the envelope. Kitamura, Kamohai, and Aurello credibly testified that the envelope still contained photographs when they were called to review them. And any photographs that Andrade did search from the envelope, if left on the table, can be considered in the probable cause determination. Given that Andrade further testified that she could not recall how she put the photographs on the table after her search, *id.*, Andrade's testimony at most suggests that she removed from the envelope any photographs that she reviewed as part of her administrative search.

those that had fallen out and scattered versus those that remained in the envelope. *See id.* at 190-95 (stating that the materials she saw was a single pile consisting of the photographs that had previously fallen out of the envelope on top, with the envelope containing additional photographs on the bottom).  And, importantly, the separation between those photographs that had fallen out of the envelope versus those remaining in the envelope still existed when Aurello reviewed the materials. *Id.* at 163-66.  Aurello reviewed only the photographs that were outside the envelope, and only "looked into the envelope to see that there was quite a few photographs in there, but I didn't thumb through those photographs in the envelope." *Id.* at 166.  In other words, Aurello reviewed only those photographs that were outside the envelope and which Moniz and Andrade had already reviewed.

Aurello was able to specifically describe the photographs he saw -- he recalled seeing photographs of "male minors in the nude posing," including a photograph of two nude boys. *Id.* at 169.  There are only two photographs that include two nude boys -- Government Exhibits 2 and 3.  Because Aurello reviewed only those photographs that were outside the envelope and Moniz and Andrade reviewed that same group of photographs as part of the administrative search, the court concludes that Moniz and Andrade necessarily saw Government's Exhibit 2

or 3 during their administrative search.

That Moniz and Andrade reviewed Exhibits 2 and/or 3 is further confirmed by the reactions each individual had upon seeing the photographs that had fallen out of the envelope. The court previously described these two exhibits as "[c]olor photographs of two prepubescent boys . . . standing naked, with both boys' penises clearly visible. The photographs are taken from above the boys, such that the angle of the photographs cut off the boys' full faces." *McCarty*, 672 F. Supp. 2d at 1092. In other words, the focus of these photographs is the children's genitalia. These photographs, compared to the other 55 photographs found in Defendant's Travel Pro bag, are certainly the most disturbing -- only nine other photographs contain child nudity (with only one other photograph focusing on the child's genitalia and cutting off the face of the child), and the remaining photographs show children semi-clothed. Yet each individual who reviewed the photographs that had fallen out of the envelope had an immediate reaction that the photographs were highly improper. Moniz testified that her immediate reaction to the photographs was "disgust;" the children in the photographs looked "uncomfortable, upset, unhappy," and in "harm's way." *Id*. at 124, 130. Moniz' reaction is consistent with Andrade's testimony that she saw numerous photographs of children, including those of children in the nude, which made her

feel "like something was wrong, that the kids were in a situation where they might be harmed." *Id.* at 24; *see also id.* at 62-63. The photographs were disturbing to Kitamura and made him feel "sick to my stomach." *Id.* at 180-82. Aurello decided "right off the bat" to call the police. *Id.* at 167.

In sum, the court finds that of the 57 photographs found in Defendant's Travel Pro bag, Moniz and Andrade reviewed a portion of them, and in particular at least Government Exhibits 2 or 3, one of 4-6, and one of 15, 18, and 19, as part of their administrative search.

### 2. *Probable Cause Determination*

For the second step, the court must make the probable cause determination. The Ninth Circuit has instructed that "[o]nce the district court determines which evidence may be considered as part of the probable cause determination, it must determine whether that evidence was 'sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *McCarty*, 648 F.3d at 840 (quoting *Jensen*, 425 F.3d at 704). The Ninth Circuit further explained:

> To show that the police had probable cause to arrest McCarty, the government is required to prove only that "'at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the

petitioner had committed or was committing an offense.'" *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (quoting *United States v. Bernard*, 623 F.2d 551, 559 (9th Cir. 1980)). Under this objective standard, the government need not "show [ ] that the officer[s'] belief is more likely true than false," *United States v. Brobst*, 558 F.3d 982, 997 (9th Cir. 2009), and need not demonstrate "probable cause for every element of the offense," *Blankenhorn v. City of Orange*, 485 F.3d 463, 472 (9th Cir. 2007) (internal quotation marks omitted). Instead, the government must show that the officers had an objectively reasonable belief that McCarty committed a crime, based on the totality of the relevant circumstances. *See Luchtel v. Hagemann*, 623 F.3d 975, 979 (9th Cir. 2010). Accordingly, the government is not required to prove that all or any of the photographs *actually exhibited* child pornography in order to establish probable cause for McCarty's arrest.

*McCarty*, 648 F.3d at 838-39 (footnote omitted).

Defendant was arrested for violation of HRS § 707-752, which prohibits the knowing possession of child pornography. *See* HRS § 707-752(1). "Child pornography" is defined as "any pornographic visual representation, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexual conduct," *id.* § 707-752(2), with "sexual conduct" including, among other things, "lascivious exhibition of the genital or pubic area of a minor." *Id.* "'Lascivious' means tending to incite lust, to deprave the morals with respect to sexual relations, or to produce voluptuous or lewd emotions in the average

16

person, applying contemporary community standards." *Id*.

Although the government need not establish that the photographs Moniz and Andrade viewed constitute child pornography, *see McCarty*, 648 F.3d at 839, there is no dispute that if Andrade and Moniz viewed child pornography, then Serrao certainly had probable cause to arrest Defendant for violation of HRS § 707-752. And applying the factors outlined in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987),[9] the court easily concludes that the Government's Exhibits 2 and 3 are clearly presented "to arouse or satisfy the sexual cravings of a voyeur." *See Overton*, 573 F.3d at 686 (quoting *United States v. Hill*, 459 F.3d 966, 972 (9th Cir. 2006)). Specifically, the focal point of the images is the children's genitalia

---

[9] These "*Dost*" factors include:

> 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
> 2) whether the setting of the visual depiction is sexually suggestive, *i.e.*, in a place or pose generally associated with sexual activity;
> 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
> 4) whether the child is fully or partially clothed, or nude;
> 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and
> 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*United States v. Overton*, 573 F.3d 679, 686 (9th Cir. 2009) (quoting *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987)).

(their faces are cut off from view), and the children are inappropriately pulling

down their underwear specifically to display their genitalia.  Given the explicit

nature of these photographs, either one of them -- on their own -- would be

"sufficient to warrant a prudent man in believing that [Defendant] had committed

or was committing a [violation of HRS § 707-752]."

Yet in this case, Government's Exhibits 2 or 3 was not seen in

isolation and the totality of the circumstances further confirm that probable cause

existed to arrest Defendant.  Andrade and Moniz did not see only one photograph,

but saw *several* photographs of nude and partially nude children.  Moniz described

that the children in the photographs looked "uncomfortable, upset, unhappy," and

in "harm's way."  Doc. No. 57 at 130.  Moniz further specifically identified that

she saw a photograph of a "child that was naked like a pond setting by a rock,"

which corresponds to Government's Exhibits 4, 5, or 6.[10]  Even without

Government Exhibit 2 or 3, Exhibits 4, 5, or 6, when placed in context with

---

[10]  The court previously described these exhibits as follows:

> 4–5. Color photographs of a nude prepubescent boy appearing to
> be between the age of 7 to 10, standing beside a stream and
> covering his genitals with one hand. A portion of the boy's pubic
> area is visible in both photographs.
> 6. Color photograph of the same boy in the same location as
> Plaintiff's Exhibits 4-5, but reaching for clothing. The boy's penis
> is fully visible.

*McCarty*, 672 F. Supp. 2d at 1092.

additional photographs of semi-nude boys, establishes an objectively reasonable belief that Defendant committed a violation of HRS § 707-752 -- the boy in the photograph, between the age of 7 to 10, is too old to be photographed nude naturally and his body is the focus of each photograph.  Further, when viewed alongside any of the additional photographs (all of which feature semi-nude children), its intent is clear -- to elicit a sexual response in the viewer.

Thus, based on all of the relevant circumstances -- that Moniz and Andrade saw photographs of nude and semi-nude children, at least one, if not two photographs they saw contained child pornography, and there were additional photographs that they were aware of -- the court finds that the HCPD officers had an objectively reasonable belief that Defendant had committed a violation of HRS § 707-752.

## B.    Defendant's Additional Arguments for Suppression

Because the court previously found that the government had not established probable cause to arrest Defendant, the court suppressed all evidence obtained during the subsequent consent and warrant-based searches as fruit of the poisonous tree.  Because the court now finds that probable cause existed, the court addresses Defendant's additional arguments seeking to suppress certain evidence obtained following his arrest (namely computer data found in his luggage and his

statement to HCPD).  The court first outlines the relevant facts regarding these
post-arrest events, and then addresses Defendant's arguments.

### 1.     Facts

#### a.     Defendant's consent to search luggage

Defendant was arrested at the Hilo International Airport at
approximately 10:30 a.m., and transported to the Hilo police station.  Doc. No. 60
at 73.  At approximately 1:52 p.m., HCPD Detective John Ancheta ("Detective
Ancheta") interviewed Defendant while in custody.  After asking Defendant some
preliminary questions (*e.g.*, his name, birth date, address, that Defendant knew why
he was arrested, etc.), Detective Ancheta asked for and received consent to search
Defendant's luggage without a warrant.  Gov't Ex. 92 at 26-28.[11]

Specifically, Detective Ancheta explained that he would like
permission to look through Defendant's bags, but that "it's up to you if you wanna
consent to the search or not."  *Id.* at 27.  Detective Ancheta further explained that
Defendant was "arrested for Promoting Child Abuse, [which] entails just the mere
possession of what looks like child pornography," that he believed that the officers
"had enough at the time to arrest you for it," and that he wanted to search the bags

---

[11]  At the October 20, 2009 hearing, portions of the recording on Detective Ancheta's
interview with Defendant were played.  The court has also listened to the recording.  *See* Gov't
Ex. 91.

"in order for us to get a little further . . . to verify what they had saw, seen down at the airport." *Id.*  Detective Ancheta therefore provided Defendant HCPD's "Advice of Search and Seizure Rights and Consent to Search" form.  Detective Ancheta started to read the form aloud to Defendant, at which point Defendant started to read the form aloud, including that "[y]ou have a constitutional right not to have a search made of your premises, vehicle, property without a search warrant and to refuse consent of such search without a warrant." *Id.* at 28.

After reading this statement, Defendant said, "[o]kay, so, so I mean, I have a right to, to keep my bags," *id.*, which Detective Ancheta took to mean that Defendant believed that he would be allowed to keep his bags if he consented to the search.  Doc. No. 60, at 42-43.  Defendant then sought further clarification regarding the process:

> Defendant:  So but what, what happens then?  I mean I'm, I'm this is all new to me.  And this is, you know, and if I, if I . . .
> Detective Ancheta:  Well
> Defendant:  You need to search them anyway or is it, you know.
> Detective Ancheta:  Yes, we do need to search it anyway.
> Defendant:  Yeah.
> Detective Ancheta:  If, If, all I can say if you give us an opportunity to give us consent.  If not, you know, if you don't want, that's fine.  We'll try to obtain a warrant to search your bag.  And we'll do it that way and it's gonna take a little time.  That's all.
> Defendant:  Okay.

Gov't Ex. 92 at 28.

Detective Ancheta then explained that he was "not sure what time you're supposed to be flying back," but that "[d]uring any criminal investigation we have up to 48 hours to either release you or charge you for whatever you're arrested for." *Id.* at 29. After Defendant asserted that he had "no idea of my rights in terms of being" and has never been arrested, Detective Ancheta explained that if Defendant gave permission for the search, HCPD can "just see what's there. What they were talking about and from the airport yeah. And then if anything, most like we probably can you, give the bags back and whatever stuff we don't need and you can just take the bags with you." *Id.*

According to Defendant, he was confused throughout this process; he was not familiar with United States law and had never been previously arrested. Doc. No. 60. at 74-75. From what Detective Ancheta stated, however, Defendant believed that his consent ultimately did not matter because his bags would be searched anyway and consenting may allow him to leave sooner. *Id.* at 75, 82-83. Defendant further testified that he believed that signing the forms was "something that had to be done" to speed up the process, *id.* at 82-83, and that HCPD would keep the envelope of photographs and would probably allow him to travel on to Oahu. *Id.* at 75-76, 82.

After Detective Ancheta read aloud once more the form's statement that Defendant has the constitutional right not to have a search made of his property, Defendant stated, "[o]nce again, if I don't you will, you will obtain a warrant," to which Detective Ancheta stated "yes."  Gov't Ex. 91; *see also* Gov't Ex. 92 at 30.[12]  Defendant then continued his statement with "and then it will just take longer time.  Just I'm trying to understand everything so."  Gov't Ex. 92 at 30. Detective Ancheta encouraged him to ask more questions and then turned to filling out of the forms.  *Id.*  Defendant signed the forms and initialed that he consented to a complete search of his luggage and that the consent is given "voluntarily and without threats or promises of any kind being made to my by anyone."  *See* Gov't Exs. 94-95.  After signing the forms, Defendant again focused on the return of his luggage, and sought confirmation that "I'll get stuff back or whatever," to which Detective Ancheta explained that HCPD would photograph the items and keep contraband.  *Id.*; *see also* Doc. No. 60 at 45 (Detective Ancheta explaining that Defendant's full attention was on getting his bags back).

---

[12]  The transcript of this interview, Government Exhibit 92, does not include that Detective Ancheta stated "yes" between Defendant's statements of "[o]nce again, if I don't you will, you will obtain a warrant," and "and then it will just take longer time."  At the November 21, 2011 hearing, the parties agreed that tape recording reflects that Detective Ancheta said "yes."  *See* Gov't Ex. 91.

b.    *Defendant's waiver of his* Miranda *rights*

After receiving Defendant's consent to search the bags, at

approximately 2:05 p.m., Detective Ancheta provided Defendant HCPD's "Advice

of Rights" form and explained that "we're mandated to read this form to before we

ask them any questions relative to any criminal complaint."  Gov't Ex. 92 at 31.

Detective Ancheta therefore read from the form:

> I want to inform you of your rights.
> 1.    You have the right to remain silent.  You do not have to answer any questions.
> 2.    Anything you say may be used against you in a court of law.
> 3.    You have the right to talk to a lawyer before you answer any questions and to have him with you during questioning.
> 4.    If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> 5.    If you decide to answer the questions now without a lawyer present, you still have the right to stop answering at any time and talk to a lawyer.

Gov't Ex. 93; *see also* Gov't Ex. 92 at 32.

Defendant and Detective Ancheta then turned to filling out the form.

The form included three questions for Defendant to initial either "yes" or "no,"

including: "(1) Do you understand the rights that I have just read to you? (2) Do

you want a lawyer now? [and] (3) Would you like to tell me what happened?"

Gov't Ex. 93.  Detective Ancheta first asked, "Do you understand the rights that I

have read to you?  I need your initials by the yes or no."  Gov't Ex. 92 at 32.  In

response, Defendant initialed "yes" as to the first question.  Gov't Ex. 93.

Detective Ancheta then asked Defendant, "[d]o you want a lawyer now?"  Gov't

Ex. 92 at 32, at which point Defendant began to initial that he wanted an attorney.

Gov't Ex. 93; Doc. No. 60 at 48.  Detective Ancheta interrupted Defendant by

explaining:

> Detective Ancheta: . . . It's a question that has to be
> asked by, as far as asking for a lawyer now.  We can't
> give you one right now.  You'[re] going to have to go to
> court, show up for it and they'll assign a lawyer for you.
> Defendant:  Okay, well I'll just sign.
> Detective Ancheta:  Yes or no?  You're gonna say yes?
> Defendant:  Well.
> Detective Ancheta:  We can't bring in a lawyer now
> that's why.  Your gonna have to
> Defendant: [Okay, well, so I can't say yes then.][13]

Gov't Ex. 91; Gov't Ex. 92 at 32; *see also* Doc. No. 60 at 48.

Detective Ancheta testified that Defendant's response made Detective

Ancheta believe "there was some confusion going on," Doc. No. 60, at 49, so

Detective Ancheta tried to explain that HCPD could not bring an attorney in at this

time and that "[w]e would have to go to court to get one assigned to him at that

---

[13]  The transcript of the interview states that Defendant said, "If a lawyer can't come, say yes then?"  Gov't Ex. 92, at 32.  The court has listened to the tape recording and Defendant's statement was "Okay, well, so I can't say yes then."  *See* Gov't Ex. 91.  At the November 21, 2011 hearing, the parties agreed that the court's interpretation of the recording was accurate.

time." *Id* at 50.  Detective Ancheta did not explain, however, that Defendant could

call his own attorney.  *Id.* at 51.  Indeed, according to Defendant, when Detective

Ancheta told him that an attorney was not available and that Defendant would

"have to go to court, show up for it and they'll assign a lawyer for you," Defendant

did not understand that he could make a phone call to an attorney; rather, he

believed that the first opportunity he would have to an attorney was after he went

to court.  Doc. No. 60 at 84-85.

In response to Defendant's statement, "[o]kay, well so I can't say yes

then," Detective Ancheta explained:

> Detective Ancheta:  You can say yes but I'm not going to
> ask you anything about the crime after that.  I can't ask
> you anything about the crime.  Because the lawyer would
> have to be the one to advise you, yeah.  But if you want
> to explain to me what's, what, what happened or, it's up
> to you.  And like I said, at any time you can stop and ask
> for a lawyer if you feel that you need one.
> Defendant:  Okay.
> [two-minute pause while Detective Ancheta takes phone
> call]
> Detective Ancheta:  Okay Simon, what have you
> decided?
> Defendant:  I don't, I don't want a lawyer until necessary
> so I'll put no there.

Gov't Ex. 91; Gov't Ex. 92 at 32; *see also* Doc. No. 60 at 48.

Defendant therefore fully initialed the "no" column in response to "Do

you want a lawyer now?" *see* Gov't Ex. 93, even though Defendant thought that

having an attorney present would be a good idea. Doc. No. 60 at 86-87. Defendant asserts that had he understood that an attorney could be called he would have called one; instead he signed the forms based on the belief that he would be let out and could travel on to Oahu. *Id.* at 88-89.

In reviewing the form with Detective Ancheta, Defendant verified that while he put an "S" in the yes column for the question of "Do you want a lawyer now?," he initialed "SM" in the "no" column. Gov't Ex. 92 at 32-33. The fully completed Advice of Rights Form shows that Defendant initialed that he understood the rights he was read, that he did not want a lawyer, and that he would like to talk with Detective Ancheta about what happened. Gov't Ex. 93.

c.    *Defendant's statements during the interview and consent to search the laptop computer*

In the interview that followed, Defendant admitted that he had the pictures in the envelope for his "fantasies" and that he would masturbate to them. Gov't Ex. 92 at 31, 35. In response to whether he has ever "done anything with children," Defendant stated that he is "not gonna go into things that happened and I haven't raped and I haven't forced myself on anybody and that thing just playing around type of thing [sic] in the past." *Id.* at 34. Defendant further admitted that there were additional images on his laptop computer, which he downloaded using Lime Wire. *Id.* at 35-36. Detective Ancheta then asked for and received consent

to search Defendant's laptop computer.  *Id.* at 38.

After 18 minutes of interviewing Defendant, Defendant Ancheta broke the interview and performed a cursory search of Defendant's two pieces of luggage, removing the laptop computer from Defendant's Travel Pro bag and an external hard drive and some flyers from the Travel Zone bag.  Doc. No. 60 at 32-34; *see also* Gov't Exs. 97-99.  Detective Ancheta subsequently returned the luggage to Defendant's property in cellblock.  Doc. No. 60 at 35, 46.

Detective Ancheta spoke with Defendant two more times that day. During his second discussion with Defendant, Detective Ancheta reminded Defendant of his *Miranda* rights and spoke with him for less than 10 minutes. Defendant told Detective Ancheta that he had videos that include young girls on his laptop computer that he downloaded off of Lime Wire.  Gov't Ex. 92 at 42. During his third discussion several hours later, Detective Ancheta again reminded Defendant of his *Miranda* rights and gave Defendant property receipts.  Defendant admitted that an external hard drive located in his Travel Zone bag also contained "Limeware stuff."  *Id.* at 48.

> d.    *The search warrants*

After Defendant's arrest, HCPD contacted U.S. Immigration and Customs Enforcement ("ICE"), which agreed to take on the investigation.  Doc.

No. 60 at 59.  As a result, a federal arrest warrant issued for Defendant on August

7, 2008.  *Id.* at 59-60.  ICE Special Agent Chris Kobayashi transported Defendant

and his T-mobile cellular phone, luggage, and the envelope with its contents to

Honolulu; the laptop and external hard drive were shipped via Federal Express.  *Id.*

at 60-61.  On September 4, 2008, ICE Special Agent Law ("Agent Law") applied

for three warrants to search Defendant's luggage, computer media, and cellular

telephone.  United States Magistrate Judge Kevin S.C. Chang issued warrants on

September 4, 2008.  *See* Doc. No. 99.  Prior to obtaining these search warrants,

ICE did not conduct any search of these items.  Doc. No. 60 at 61.

 The government asserts that a forensic examination of Defendant's

laptop computer, external hard drive, and two DVDs revealed almost 400 still

images of child pornography and almost 200 child pornography video clips, of

which approximately 60 depict Defendant engaging in sexual acts with at least

three different pre-pubescent boys.

### 2. *Analysis*

 Defendant argues that (1) evidence found in his luggage must be

suppressed because Defendant's consent to have his luggage searched was not

voluntary;[14] and (2) his statements to police must be suppressed because his waiver

of *Miranda* rights was not knowing and intelligent.  The court addresses these

arguments in turn.

       *a.    Defendant's luggage*

       "It is well settled under the Fourth and Fourteenth Amendments that a

search conducted without a warrant issued upon probable cause is per se

unreasonable subject only to a few specifically established and well-delineated

exceptions.'"  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting  *Katz*

*v. United States*, 389 U.S. 347, 357 (1967)).  One of those "well-delineated

exceptions" is "a search that is conducted pursuant to consent."  *Id.*; *see also*

*United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) ("[A warrantless] search

conducted pursuant to a valid consent is constitutionally permissible." (quoting

*Bustamonte*, 412 U.S. at 222)).

       A consent to search is valid if the consent was freely and voluntarily

given and not the result of duress or coercion, express or implied.  *Bustamonte*, 412

U.S. at 227; *see also United States v. Cormier*, 220 F.3d 1103, 1112 (9th Cir.

2002) (stating that the consent must be "voluntary and intelligent").  "[W]hether a

---

[14] Because the court finds that Defendant's consent to search was valid, the court need
not reach the government's additional arguments against suppression.

consent to a search was in fact 'voluntary' or was the product of duress or

coercion, express or implied, is a question of fact to be determined from the totality

of all the circumstances." *Bustamonte*, 412 U.S. at 227; *see also Cormier*, 220

F.3d at 1112.

Several non-exclusive factors may assist the court in determining

whether a person has voluntarily consented to the search, including:

> (1) whether defendant was in custody; (2) whether the
> arresting officers had their guns drawn; (3) whether
> *Miranda* warnings were given; (4) whether the defendant
> was told he had the right not to consent; and (5) whether
> the defendant was told that a search warrant could be
> obtained.

*United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (quoting

*United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)).  "No one factor is

determinative in the equation [and] these factors are only guideposts, not a

mechanized formula to resolve the voluntariness inquiry."  *Id.* at 502 (citing

*Bustamonte*, 412 U.S. at 224 (rejecting "talismanic definition of 'voluntariness'

mechanically applicable" to all situations)).  Indeed, although these factors "aid in

the decision making process, the full richness of any encounter must be considered

. . . .  Every encounter has its own facts and its own dynamics.  So does every

consent."  *United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995), *overruled

on other grounds by Georgia v. Randolph*, 547 U.S. 103 (2006).

Where the defendant is a foreign national, the court should also determine voluntariness

> by examining, among other things, whether the defendant signed a written waiver; whether the advice of rights was in the defendant's native language; whether the defendant appeared to understand those rights; whether the defendant had the assistance of a translator; whether the defendant's rights were explained painstakingly; and whether the defendant had experience with the American criminal justice system.

*United States v. Amano*, 229 F.3d 801, 804-05 (9th Cir. 2000) (citing *United States v. Garibay*, 143 F.3d 534, 538 (9th Cir. 1998)). It is the government's burden to prove that the consent was freely and voluntarily given. *Patayan Soriano*, 361 F.3d at 501.

In considering these factors, the court has the benefit of both the tape recording of the conversation between Detective Ancheta and Defendant, as well as their testimony regarding this event. Although Defendant had been in custody for over three hours at the time that Detective Ancheta sought consent and there is no evidence that Defendant was provided his *Miranda* rights up until this point,[15]

---

[15] Although the government argues that Defendant was informed of his *Miranda* rights, Defendant provided a separate consent to have his luggage searched before he was *Mirandized* (although he provided consent to search the laptop computer after he was *Mirandized*). "When a *Miranda* warning follows rather than precedes the purported consent, it cannot support the voluntariness of the consent." *United States v. Perez-Lopez*, 348 F.3d 839, 847 (9th Cir. 2003). With that said, however, "[i]t is open to question . . . whether the inclusion or exclusion of

(continued...)

no guns were drawn, Defendant was not handcuffed, *see* Doc. No. 60 at 91, and

Detective Ancheta discussed the consent issue with Defendant in a

non-confrontational, conversational tone in which Defendant asked questions and

Detective Ancheta answered them. Detective Ancheta explained in some detail

that Defendant had a right not to have his bags searched -- Detective Ancheta

provided Defendant the "Advice of Search and Seizure Rights and Consent to

Search" form and explained to Defendant that he had the right to refuse consent to

have his bags searched. *See United States v. Mendenhall*, 446 U.S. 544, 559

(1980) ("[T]he fact that the officers themselves informed the respondent that she

was free to withhold her consent substantially lessened the probability that their

conduct could reasonably have appeared to her to be coercive."); *Patayan Soriano*,

361 F.3d at 504 (stating that "knowledge of the right to refuse consent is highly

relevant in determining whether a consent is valid" (quotations omitted)). Indeed,

Defendant even read aloud that statement that "[y]ou have a constitutional right not

to have a search made of your premises, vehicle, [or] property without a search

warrant and to refuse consent of such search without a warrant." Further, although

Defendant is a British citizen and asserts that he has no knowledge of the United

---

[15](...continued)
*Miranda* warnings in a given set of circumstances should weigh much in either direction in
considering voluntariness." *Id.* Thus, at most, this factor weighs only slightly against a finding
of voluntariness as to Defendant's consent to search his luggage.

States legal system, he signed a written waiver, the advice of rights was in English (his native language), Defendant testified that he understood the words in the consent form, *see* Doc. No. 60 at 92-93, and he clearly demonstrated his understanding by asking questions.

As to whether Defendant was told that a search warrant could be obtained, Detective Ancheta informed Defendant that HCPD could obtain a warrant to search Defendant's bags. How this factor weighs in the consent analysis, however, "depends on the particular circumstances of the case and thus hinges on whether a suspect is informed about the possibility of a search warrant in a threatening manner." *Cormier*, 220 F.3d at 1112. For example, threatening "a defendant with a search warrant intimates that the 'withholding of consent would ultimately be futile.'" *Id.* (quoting *United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir. 1994)). In other circumstances, "the failure to inform a defendant that a search warrant could be obtained constitute[s] a failure to apprise him of all his legal rights." *Id.* (discussing *United States v. Torres-Sanchez*, 83 F.3d 1123, 1130 (9th Cir. 1996)). In this case, Detective Ancheta did not raise the fact that he could obtain a search warrant to coerce Defendant into consenting; rather, Detective Ancheta explained this fact only in response to Defendant's specific question of whether HCPD "need[ed] to search them anyway." Gov't Ex. 92, at 28. Given

these circumstances, Detective Ancheta's explanation was not raised as a threat to coerce consent, but rather to fully apprise Defendant of his rights.[16]

What requires further analysis, however, is the portion of the conversation that occurred after this exchange -- Detective Ancheta was aware that Defendant wished to travel to Oahu and discussed this fact in terms of how consent might allow him to continue with his travel plans. Specifically, after Defendant had asked whether HCPD needed to search the bags anyway and Detective Ancheta explained that HCPD could obtain a warrant, Detective Ancheta told Defendant that obtaining a warrant is "gonna take a little time," and that HCPD has "up to 48 hours to either release you or charge you for whatever you're arrested for." *Id.* at 29. Detective Ancheta further explained that if Defendant consented, then HCPD can "just see what's there. . . And then if anything, most like we probably can you, give the bags back and whatever stuff we don't need and you can just take the bags with you." *Id.* (verbatim). In other words, Detective

---

[16] Even if Detective Ancheta's statements somehow implied to Defendant the "futility of withholding consent," the weight of this factor is "significantly diminished" when probable cause exists to justify a warrant. *See United States v. Patayan Soriano*, 361 F.3d 494, 504-05 (9th Cir. 2004). Defendant does not contest that the search warrants were supported by probable cause and in any event, Andrade's and Moniz's observations of child pornography from Defendant's Travel Pro bag would support probable cause for a search warrant of Defendant's bags. *See United States v. Hill*, 459 F.3d 966, 972-73 & n.9 (9th Cir. 2006); *see also United States v. Coletta*, 682 F.2d 820, 825 (9th Cir. 1982) (explaining that where officers believed that drugs would be in one bag, "probable cause to search was not limited to a specific container").

Ancheta suggested that if Defendant consented to the search, then Defendant could "probably" continue on with his travels.

The court finds that under the totality of the circumstances, Detective Ancheta's suggestion that Defendant may be able to continue his travels if he consented did not transform the consent into a product of duress or coercion. This is not a case where Detective Ancheta improperly threatened Defendant that he would be detained until a search warrant was obtained -- Defendant had already been arrested and there is no dispute that Detective Ancheta's statement that HCPD could hold Defendant for 48 hours was truthful. *See* HRS § 803-9(5) (providing that it is unlawful "[t]o fail within forty-eight hours of the arrest of a person on suspicion of having committed a crime either to release or to charge the arrested person with a crime . . . ."); *compare Eidson v. Owens*, 515 F.3d 1139, 1146 (10th Cir. 2008) ("[A] suspect's consent may be tainted by a threat to detention that essentially amounts to an arrest if consent is refused."); *United States v. Ocheltree*, 622 F.2d 992, 994 (9th Cir. 1980) (holding that consent was not voluntary where Drug Enforcement Administrative agents approached the defendant at an airport and told him that if he did not consent to the search of his brief case, he would be detained and not allowed to board his airplane until a warrant could be secured); *with United States v. Sebetich*, 776 F.2d 412 (3d Cir. 1985) (explaining that where

a warrant would be supported by probable cause, a statement by an officer that a warrant could be obtained "would not constitute deceit or trickery, but only 'a fair and sensible appraisal of the realities' facing [the defendant]" (quoting *United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974))).

Further, Detective Ancheta did not make any actual promises that Defendant would be released if he consented. Rather, Detective Ancheta simply explained that Defendant would "probably" be released if he consented. From Detective Ancheta's experience, individuals arrested on Hawaii state charges for possessing child pornography are typically released pending investigation.[17] Doc. No. 60 at 31. And Defendant conceded that Detective Ancheta made no promises regarding when Defendant would be released. *Id.* at 97. Rather, Defendant understood that his consent was not a guarantee that he would be released -- he understood that if he consented, he "would *probably* be able to travel" to Oahu, *id.* at 76 (emphasis added); and that "if I get my bags back, I *might* be able to get the flight and go meet up with everybody." *Id.* at 82 (emphasis added). That Defendant's "will [had not] been . . . overborne and his capacity for self-determination critically impaired," *see Bustamonte*, 412 U.S. at 225, is

---

[17] Defendant's was the first case that Detective Ancheta ever referred for federal investigation. Doc. No. 60, at 31.

supported by the fact that directly after this exchange, Detective Ancheta reiterated that Defendant has a constitutional right not to have a search made of his luggage, and the consent form explained that consent was being given "voluntarily and without threats or promises of any kind being made to me by anyone." *See* Gov't Ex. 95. Defendant confirmed his understanding of his rights and that he was providing consent without any threats or promises of any kind by initialing the forms.[18]

In sum, considering the totality of the circumstances, although Defendant was in custody and was not read his *Miranda* rights before providing consent, the court finds that Defendant's consent was ultimately intelligent and voluntary. Detective Ancheta apprised Defendant of his rights several times and they engaged in a non-confrontational conversation where Defendant felt comfortable enough to ask questions to confirm his understanding of his rights and likely next steps. Detective Ancheta answered Defendant's questions and explained to Defendant likely next steps in light of his experience. To the extent

---

[18] Even if Defendant understood Detective Ancheta's statements as a promise that he would be released (which this court rejects), such understanding was not reasonable in light of the circumstances. The court recognizes that it must take into the account the "possibly vulnerable subjective state of the person who consents," *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973), but it must consider such state in terms of its reasonableness in light of the objective conduct of the officers. *See United States v. Castrillon*, 716 F.2d 1279 (9th Cir. 1983). Detective Ancheta made no actual promises, and Defendant was told that consent is ultimately his choice.

Defendant had any question about what Detective Ancheta told him, the consent form clearly stated Defendant's rights. The totality of the circumstances supports a finding that Defendant provided his consent intelligently and voluntarily and not as a result of duress or coercion, express or implied.

At the December 2, 2011 hearing, Defendant further argued that Defendant's consent was limited in time such that HCPD and ICE were unreasonable in holding his luggage for almost a month before ICE obtained search warrants. The court rejects this argument -- Defendant never limited or withdrew his consent at any time. *See United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006) ("A suspect is free, however, after initially giving consent, to delimit or withdraw his or her consent at anytime.") (citing *Florida v. Jimeno*, 500 U.S. 248, 252 (1991)); *see also United States v. Gutierrez-Mederos*, 965 F.2d 800, 803-04 (9th Cir. 1992) (holding that defendant's statement of "go ahead" in response to request to check car for contraband "authorized the trooper to search any container within the car that reasonably could contain contraband"). The court has further reviewed the September 4, 2008 search warrants, and there is no dispute that they were supported by probable cause. Thus, Defendant consented to the search of his luggage, and Detective Aurello's cursory search and the subsequent searches pursuant to warrants were appropriate.

Further, to the extent there is any question whether Defendant's consent included consent to search the electronic media found in the luggage, the search warrants provided that ICE could search and seize "[a]ll materials, in whatever form, media, or format, including computer files, video files, digital images," etc., *see, e.g.*, Doc. No. 99-1, Attachment A, and Defendant has not challenged the legality of the search warrants. Indeed, the court has reviewed the search warrants and finds that they are supported by probable cause. Thus, even if Defendant did not consent to the search of his electronic media, the search conducted pursuant to the search warrants would have properly found these materials such that suppression is not warranted.

      b.     *Defendant's waiver of his* Miranda *rights*

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." It has long been established that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). *Miranda* therefore "created procedural safeguards to protect people against the coercive nature of custodial interrogations." *DeWeaver v. Runnels*, 556 F.3d 995, 1000 (9th Cir. 2009) (citing

*Miranda*, 384 U.S. at 467).  Specifically, *Miranda* requires that a person subjected to custodial interrogation be advised that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed.  *Miranda*, 384 U.S. at 444; *see also DeWeaver*, 556 F.3d at 1000.

Once properly advised of his rights, a suspect may waive these rights voluntarily, knowingly, and intelligently.  *Miranda*, 384 U.S. at 475.  The government must prove, by a preponderance of the evidence, that under the totality of the circumstances the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Only if the "'totality of the circumstances surrounding the interrogation' reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."  *Moran*, 475 U.S. at 421; *see also Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005).

The totality of the circumstances includes consideration of the background, experience and conduct of the suspect.  *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986); *see also North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979) ("Even when a right as fundamental as that to counsel . . . is

involved, the question of waiver must be determined on the particular facts and circumstances surrounding that case." (quotations omitted)).  Where the suspect is a foreign national, the court should also consider the same factors listed above regarding a foreign national's consent to search.  *See Amano*, 229 F.3d at 804-05.

Turning to this case, there is no dispute that Defendant was provided his *Miranda* rights -- Detective Ancheta read to him from the "Advice of Rights" form that (1) Defendant had the right to remain silent; (2) anything Defendant said may be used against him in a court of law; (3) Defendant has the right to speak to an attorney before answering any questions and to have the attorney with him during questioning; (4) counsel would be appointed for Defendant if he wanted an attorney and could not afford one; and (5) if Defendant chose to answer questions without an attorney present, that he could stop answering questions at any time and speak to an attorney.  Gov't Ex. 93; *see* Gov't Ex. 92 at 32.  Further, Detective Ancheta informed Defendant his *Miranda* rights during a non-confrontational conversation, and Defendant appeared to understand these rights.  Indeed, even though Defendant asserts a lack of knowledge regarding the United States legal system, there is no dispute that he understood the words on the form and he displayed such understanding by asking questions.  *See, e.g.*, *United States v. Labrada-Bustamante*, 428 F.3d 1252, 1259 (9th Cir. 2005) ("Agent Rodriguez was

not required to explain to Labrada what the *Miranda* rights meant. The fact that Labrada might not be familiar with the United States' form of justice is merely one factor to be considered."); *Amano*, 229 F.3d at 805 (holding that waiver was voluntary where even though the defendant was not familiar with United States criminal law, he was "advised of his rights twice, he appeared to understand those rights, and he signed a written waiver").

What the parties do dispute, however, is whether Defendant actually waived his *Miranda* rights and/or whether Detective Ancheta provided Defendant conflicting information. This dispute arises because Defendant began to initial that he wanted an attorney until Detective Ancheta explained that if Defendant wanted an attorney, HCPD could not immediately provide one and he would have to go to court to have one appointed. When Defendant stated his understanding that he *could not* request an attorney, *see* Gov't Ex. 91 ("Okay, well, so I can't say yes [to having an attorney present] then"), Detective Ancheta reiterated Defendant's *Miranda* rights that Defendant could request an attorney and if so, then Detective Ancheta would not "ask you anything about the crime after that;" alternatively, Defendant could agree to speak to Detective Ancheta and "at any time you can stop and ask for a lawyer if you feel that you need one." Gov't Ex. 91; Gov't Ex. 92 at 32. Defendant thereafter initialed that he did not want an attorney and confirmed

that although he placed an "S" to indicate that he wanted an attorney, he placed his full initials "SM" to indicate that he did not want an attorney. Gov't Ex. 92 at 33.

Viewing this exchange in its entirety, the court finds that Defendant clearly expressed to Detective Ancheta that he wished to waive his *Miranda* rights. Although Defendant was initially confused regarding his *Miranda* rights and whether an attorney would be immediately available, Detective Ancheta clarified that HCPD could not immediately provide an attorney. Detective Ancheta further emphasized that Defendant had the right to an attorney and if he wanted one, Detective Ancheta would not ask any questions. With this information, Defendant confirmed to Detective Ancheta that he did not want an attorney. In other words, Defendant clearly indicated to Detective Ancheta that he was waiving his right to an attorney.[19]

The court further finds that Detective Ancheta's statements regarding the availability of an attorney do not negate that Defendant was given his *Miranda*

---

[19] Defendant asserts that these facts are similar to *Hawaii v. Nelson*, 69 Haw. 461, 748 P.2d 365 (1987), which held that the trial court did not clearly err in finding that the defendant failed to waive his *Miranda* rights. Even if this Hawaii state case had any application to this action, the defendant in *Nelson* did not place any initials on the form in response to whether he wanted an attorney, and he testified that officers threatened and intimidated him when he stated he wanted an attorney. *Id.* at 469-470, 748 P.2d at 370. No such similar facts exist here. Again, the court emphasizes that context matters and the mere fact that an individual shows some confusion in filling out the written form is not dispositive. For instance, *Paulino v. Castro*, 371 F.3d 1083, 1087 (9th Cir. 2004), affirmed that a defendant voluntarily waived his *Miranda* rights even though he failed to confirm the waiver of his right to counsel in writing and asked "Where's the attorney?" and "You mean it's gonna take him long to come?"

warnings and voluntarily chose to waive them. *See Montejo v. Louisiana*, 556 U.S. 778, __, 129 S. Ct. 2079, 2085 (2009) ("And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick . . . ."); *Patterson v. Illinois*, 487 U.S. 285, 296 (1988) ("As a general matter . . . an accused who is admonished with the warnings prescribed by this Court in *Miranda* . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one.").

Specifically, Detective Ancheta's statements do not conflict with the *Miranda* warnings and the parties do not dispute that Detective Ancheta correctly described how Defendant would have to seek appointed counsel. Detective Ancheta's statements are similar to those given in *Duckworth v. Eagan*, 492 U.S. 195 (1989), where a defendant challenged the voluntariness of his written *Miranda* rights waiver where police explained that although he had a right to a lawyer, "[w]e have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court." *Id.* at 198 (emphasis deleted). *Duckworth* held that the waiver was voluntary. First, "the initial warnings given to respondent touched all the bases required by *Miranda*." *Id.* at 203. Second, the additional

statement that an attorney could be appointed only "if and when you go to court," was not coercive -- the instruction accurately described the procedure for an indigent to obtain counsel, and it did not conflict with the *Miranda* warnings. *Id.* at 203-04. *Duckworth* explained:

> *Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one. The Court in *Miranda* emphasized that it was not suggesting that "each police station must have a 'station house lawyer' present at all times to advise prisoners." 384 U.S., at 474, 86 S. Ct. at 1628. If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel. *Ibid.* Here, respondent did just that.

*Id.* at 204.

The reasoning of *Duckworth* applies with equal force to this case -- *Miranda* does require Detective Ancheta to explain the full scope of possibilities of how Defendant might obtain an attorney and his statements were consistent with the *Miranda* warnings. *See also United States ex rel. Placek v. Illinois*, 546 F.2d 1298, 1300 (7th Cir. 1976) (rejecting that *Miranda* warnings were constitutionally deficient where they did not advise the defendant of the right to immediate appointment of counsel). Nor was Detective Ancheta's statement coercive -- Detective Ancheta fully apprised Defendant that if he wanted an attorney, then

Detective Ancheta would not ask him any questions.  That Detective Ancheta was aware that Defendant wished to continue his travels to Oahu does not change this conclusion -- any suspect in custody has other places they would prefer to be, and Detective Ancheta made no promises that Defendant would be released sooner if he spoke to HCPD.

In opposition, Defendant argues that Detective Ancheta's statements that counsel could not be provided immediately linked the appointment of counsel to a future point in time such that Defendant was led to believe that he could not have an attorney present during questioning.  Doc. No. 93-1, Def.'s Suppl. Reply at 19.  The court disagrees that Detective Ancheta's statement was somehow inconsistent with the *Miranda* warnings provided, and the caselaw Defendant relies upon is inapposite.  Specifically, Defendant relies on *United States v. Garcia*, 431 F.2d 134, 134 (9th Cir. 1970), in which the defendant was told on the one hand that she had "a right to the presence of counsel 'when she answered any questions,'" but on the other hand that "she could 'have an attorney appointed to represent you when you first appear before the U.S. Commissioner or the Court.'"  *Garcia* held that these inconsistent warnings "failed adequately to inform Garcia of her right to counsel before she said a word."  *Id.*  In other words, the statement that counsel would be provided at her first court appearance suggested that the defendant could

not obtain an attorney before speaking to the police.

In contrast to *Garcia*, Defendant was consistently told that he had the right to an attorney before being questioned by the police.[20]  And to the extent that Defendant was confused by Detective Ancheta's statement that Defendant would need to go to court to have counsel appointed and/or believed that he could not have counsel present, Detective Ancheta clarified that if Defendant wanted counsel, Detective Ancheta would not question him.  Such statement is wholly consistent with *Miranda.*

In sum, "[t]he [relevant] inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*."  *Duckworth*, 492 U.S. at 203.  Based on the totality of the circumstances, the court finds that Detective Ancheta's statements did so here and that Defendant's waiver of his *Miranda* rights was voluntarily given.  The court therefore DENIES Defendant's Motion to Suppress his statements to HCPD.

---

[20]  Defendant further argues that Detective Ancheta failed to make "it clear to McCarty that if McCarty invoked his right to an attorney, questioning would have to stop."  *See* Doc. No. 93-1, Def.'s Suppl. Reply at 19.  The court rejects this argument as clearly contrary to the evidence -- Detective Ancheta explained that he would not question Defendant if he wanted an attorney present, and that if he did answer questions, "at any time you can stop and ask for a lawyer if you feel that you need one."  Gov't Ex. 92 at 32.

**C.      Whether Suppression Is Necessary Due to the Fourth Amendment Violations**

The Ninth Circuit held that TSA screeners violated Defendant's Fourth Amendment rights by reading the content of letters and newspaper clippings.  Kamohai also had Moniz search Defendant's Travel Zone bag, and the government does not dispute that this search also violated Defendant's Fourth Amendment rights.  At the November 21, 2011 hearing, Defendant conceded that these Fourth Amendment violations, on their own, do not support suppression of any evidence at trial -- the evidence that will be presented at trial would have been inevitably discovered absent these Fourth Amendment violations.  Accordingly, the court finds that the Fourth Amendment violations in this action do not require suppression of any evidence at trial.

///

///

///

///

///

///

///

## III.  <u>CONCLUSION</u>

Based on the above, the court DENIES Defendant's Motion to Suppress.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 13, 2011.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge